[EDITORS' NOTE: THIS OPINION IS DEPUBLISHED UPON GRANTING OF PETITION FOR REVIEW. THE OPINION APPEARS BELOW WITH A GRAY BACKGROUND.]
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 765 
OPINION
A jury convicted defendant, Raul A. Sanchez, of the misdemeanor of indecent exposure (Pen. Code, § 314, subd. 1). He was sentenced to local time and appealed to the appellate department of the trial court. The appellate department, in aper curiam opinion, reversed defendant's conviction because it concluded, although disagreeing with it, that it was bound under Auto Equity Sales, Inc. v. Superior Court
(1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937], to follow an appellate court opinion which was not then final, and for which review before the California Supreme Court has since been granted.[1] The appellate department then certified the case for transfer to this court, pursuant to California Rules of Court, rules 8.1002 and 8.1005, and we granted the transfer. Since then, the California Supreme Court deferred action in the case for which it granted review, pending the outcome ofPeople v. Stevens (2009) 47 Cal.4th 625
[101 Cal.4th 14, 218 P.3d 272] (Stevens), which has now been decided. We here reject defendant's contention that his right to a fair trial was violated by the security measures used during this trial and we affirm the judgment. Our decision is consistent with the recent holdings by the California Supreme Court in Stevens.
The facts will be discussed as they are relevant to the issue raised.
 ISSUE AND DISCUSSION
According to the record before us, a deputy followed defendant as he walked from his chair at counsel table to the witness stand. The deputy then variously stood or sat behind defendant, near the jury box, while defendant testified, being sure not to block the jury's view of defendant. He stood "at ease," his gun remained holstered and he did not have his hand on his belt. When defendant finished testifying, the deputy followed him back to his seat at counsel table. Although not specifically mentioned by the trial court, defendant was in custody throughout trial and was dressed in civilian clothes for it.
Defendant moved for a mistrial on the basis that the deputy's activities deprived him of a fair trial. The trial court denied his motion, finding that the deputy's positioning was no more prejudicial than having him in the courtroom. Additionally, the trial court said, "The deputy's obligation is to escort the [defendant] to the witness stand when we have a defendant, for the safety of the public and the Court, and the deputy is going to stand somewhere in the general vicinity of the defendant, and the jury knows he's the defendant in a criminal case. I'm sure they can conclude why we have a deputy in the courtroom to begin with." *Page 767 
Defendant contends that because the deputy's actions were not justified by manifest necessity, they deprived him of a fair trial. We disagree.
"[T]he right to a fair trial . . . does not mean . . . that every practice tending to single out the accused from everyone else in the courtroom must be struck down. Recognizing that jurors are quite aware that . . . defendant . . . did not arrive . . . by choice or happenstance, we have never tried, and could never hope, to eliminate from trial procedures every reminder that the State has chosen to marshal its resources against a defendant to punish him for allegedly criminal conduct. . . . [¶] . . . [H]owever[,]. . . . certain practices pose such a threat to the `fairness of the factfinding process' that they must be subjected to `close judicial scrutiny.' [Citation.] . . . [¶] . . . [We do not believe that] the conspicuous, or at least noticeable, deployment of security personnel in a courtroom during trial is the sort of inherently prejudicial practice that . . . should be permitted only where justified by an essential state interest specific to each trial. . . . [¶] The chief feature that distinguishes the use of identifiable security officers from courtroom practices we might find inherently prejudicial is the wider range of inferences that a juror might reasonably draw from the officers' presence. While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards. If they are placed at some distance from the accused, security officers may well be perceived more as elements of an impressive drama than as reminders of the defendant's special status. Our society has become inured to the presence of armed guards in most public places. . . . [¶] . . . [I]t is possible that that the sight of a security force within the courtroom might under certain conditions `create the impression in the minds of the jury that the defendant is dangerous or untrustworthy.' [Citation.] However, `reason, principle and common human experience' [citation], counsel against a presumption that any use of identifiable security guards in the courtroom is inherently prejudicial. In view of the variety of ways in which such guards can be deployed, we believe that a case-by-case approach is more appropriate. [¶] . . . [¶] . . . [T]he question must be . . . whether `an unacceptable risk is presented of impermissible factors coming into play.' [Citation.] [¶] . . . [Did the practice] . . . tend . . . to brand [defendant] in the[] eyes [of the jury] `with an unmistakable mark of guilt[?]' [Citation.] . . . [¶] . . . [¶]. . . . [I]f the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over." (Holbrook v. Flynn (1986) 475 U.S. 560,567-572 [89 L.Ed.2d 525, 106 S.Ct. 1340] (Holbrook).) *Page 768 
The United States Supreme Court in Holbrook concluded that the presence of four armed state troopers sitting in the front row of the spectators' section of the court room, in addition to the eight other officers present, were not "so inherently prejudicial that [the defendant] was thereby denied his constitutional right to a fair trial" as he was being tried with five codefendants. (Holbrook, supra,475 U.S. at p. 570.) The court went on to hold, "[E]ven were we able to discern a slight degree of prejudice attributable to the troopers' presence . . ., sufficient cause for this level of security could be found in the State's need to maintain custody over defendants who had been denied bail after an individualized determination that their presence at trial court not otherwise be ensured." (Id. at p. 571.)
A great deal has changed since the high court's pronouncement inHolbrook that "[o]ur society has become inured to the presence of armed guards in most public places." (Holbrook,supra, 475 U.S. at p. 569.) In fact, law-abiding citizens are routinely treated as suspected terrorists at airports, courthouses and other governmental buildings and suspected robbers at banks. At airports, the pulling aside of randomly chosen passengers for detailed questioning or more intrusive body searches in the presence of others is common, as is the forced removal of all passenger's shoes and the mandatory repeated showing of one's boarding pass and identification, the latter of which triggers others present to whisper, "Is that person a terrorist?" It is difficult to fathom that jurors, who are routinely subjected to such treatment, would look askance at an armed deputy near a testifying defendant.
In People v. David (1939) 12 Cal.2d 639, 644
[86 P.2d 811] (cited with approval in People v. Duran (1976)16 Cal.3d 282, 291, fn. 8 [127 Cal.Rptr. 618, 545 P.2d 1322]), the California Supreme Court rejected the defendant's contention that reversal of his conviction was appropriate because a deputy sheriff had seated himself immediately behind the defendant as the latter sat at counsel table.
In People v. Marks (2003) 31 Cal.4th 197, 223
[2 Cal.Rptr.3d 252, 72 P.3d 1222], a marshal had been seated four to five feet from the defendant, facing his side, as the latter testified. The California Supreme Court held, "Defendant cites[People v.]Duran[, supra, 16 Cal.3d at p. 282] for the proposition that there must be a `manifest need' for the placement of the marshal so close to him as he testified.Duran imposed the manifest need standard for the use ofphysical restraints. [Citation.] Duran
expressly distinguished such shackling from monitoring by security personnel. . . . The Duran holding encompassed not only the standard positioning of officers but also their unusual deployment, as is shown by its citation to People v.David. . . . The distinction between shackling and monitoring is long-standing. . . . People v. *Page 769 Harrington (1871) 42 Cal. 165 . . . was the primary authority on which Duran relied, and its reasoning indicates that courtroom monitoring by security personnel does not necessarily create the prejudice created by shackling. . . . [¶] We therefore maintain this distinction between shackling and the deployment of security personnel, and decline to impose the manifest need standard for the deployment of marshals inside the courtroom." (Id. at pp. 223-224.)
"[S]ecurity measures, [other than] [v]isible physical restraints . . . [¶] . . . may not require [manifest need] and reside within the sound discretion of the trial court. . . . [T]he presence of armed guards in the courtroom would not require justification on the record `[u]nless they are present in unreasonable numbers.' [Citation.] [¶] . . . [¶] . . . [P]ursuant to [Holbrook, supra, 475 U.S. 560], `the use of identifiable security guards in the courtroom . . . is not inherently prejudicial,' in large part because such a presence is seen by jurors as ordinary and expected and because of the many nonprejudicial inferences to be drawn from the presence of such security personnel. [Citation.] We examine on a case-by-case basis . . . whether a defendant actually has been prejudiced by the presence of security officers." (People v.Jenkins (2000) 22 Cal.4th 900, 995, 998
[95 Cal.Rptr.2d 377, 997 P.2d 1044].)
In People v. Ainsworth (1988) 45 Cal.3d 984, 993, 1002
[248 Cal.Rptr. 568, 755 P.2d 1017], the defendant, who was tried with a codefendant, objected to the number of deputies in the courtroom (between four and six) and their placement (when there were six, two were near the doorway, and, on one occasion, one was behind the codefendant while two were behind the defendant). In rejecting the defendant's contention that he was denied due process and a fair trial, the California Supreme Court held, "Unless armed guards are present in an unreasonable number, their presence need not be justified by the court or the prosecutor. [Citation.] Undoubtedly, more than the usual number of guards were present . . . during trial. . . . However, the [trial] court's remarks when overruling defendant's objections reflect the court's implicit decision that the presence of four to six uniformed guards was not unreasonable. From the limited record before us, it appears that the guards were strategically placed in the courtroom and were primarily concerned with security outside the courtroom. Given the nature of the charges [(special circumstance murder)], we cannot say that the trial court erred in concluding that the measures taken were not unreasonable." (Id. at pp. 1003-1004.)
"A trial court has broad power to maintain courtroom security and orderly proceedings." (People v. Hayes (1999)21 Cal.4th 1211, 1269 [91 Cal.Rptr.2d 211, 989 P.2d 645].) We cannot conclude that the court here abused that discretion. *Page 770 
There is no authority for defendant's analogy of the deputy accompanying him to and from the stand and standing/sitting behind him as he testified as a "human shackle." Neither do the above cited authorities otherwise require that a manifest need be demonstrated for the deputy's actions. We agree with the trial court that there is no significant difference between the deputy being in the courtroom in the first place, and, as the trial court pointed out, close to defendant for the security of the court and the public, [2] a matter with which defendant does not take issue, and his continuing to do so when defendant moved through the courtroom as was necessitated by his taking the stand. The trial court's reasoning was sound and its ruling did not constitute an abuse of discretion.
Recently, in Stevens, the California Supreme Court held that "the stationing of a courtroom deputy[3] next to a testifying defendant is not an inherently prejudicial practice that must be justified by a showing of manifest need. . . . [¶] . . . [¶] . . . [A] `trial court has broad power to maintain courtroom security and orderly proceedings.' [Citation.] For this reason, decisions regarding security measures in the courtroom are generally reviewed for abuse of discretion. [Citations.] [¶] . . . [¶] . . . [V]isible physical restraints must survive heightened scrutiny and be justified by a particular need. . . . [¶] But the stringent showing required for physical restraints like shackles is the exception, not the rule. Security measures that are not inherently prejudicial need not be justified by a demonstration of extraordinary need. . . . [¶] In [People v.]Duran[, supra, 16 Cal.3d 282, we specifically distinguished shackling from the use of armed guards in the courtroom. [Citation.] We explained that unless the guards `are present in unreasonable numbers, such presence need not be justified by the court or the prosecutor. [Citation.]' California courts have long maintained this distinction between the presence of security officers and the imposition of physical restraints. . . . [¶] . . . [In Holbrook, supra,475 U.S. 560, the United States Supreme Court said,] `The chief feature that distinguishes the use of identifiable security officers from courtroom practices we might find inherently prejudicial is the wider range of inferences that a juror might reasonably draw from the officers' presence. While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at *Page 771 
large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of guards. . . . Our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm. [Citation.]' . . . [¶] Indisputably, events in recent years have resulted in security guards becoming even more ubiquitous than when [Holbrook was decided]. . . . [T]he presence of security guards in the courtroom `is seen by jurors as ordinary and expected. [Citation.]' . . . [¶] . . . [¶] . . . Although a deputy's presence next to a testifying defendant may be viewed as a defendant-focused practice when officers do not accompany other witnesses to the stand, the [United States] Supreme Court has made it clear that not `every practice tending to single out the accused from everyone else in the courtroom must be struck down.' [Citation.] . . . That a security practice seems to focus attention on the defendant is not enough, without more, to render the practice inherently prejudicial. [¶] . . . The United States Supreme Court has previously approved the posting of uniformed, armed troopers immediately behind defendants sitting at counsel table. [Citation.] This accepted practice is not transformed into an inherently prejudicial measure simply because an officer rises with the defendant and maintains the same proximity to him while he testifies. . . . The presence of a deputy does not directly impair the accused's mobility, nor does it create an affront to human dignity that we have lamented in the context of visible shackles. [Citation.] . . . [S]o long as the deputy maintains a respectful distance from the defendant and does not behave in a manner that distracts from, or appears to comment on, the defendant's testimony, a court's decision to permit a deputy's presence near the defendant at the witness stand is consistent with the decorum of courtroom proceedings. [¶] . . . Further, the jury was properly instructed to disregard the fact that defendant was in custody." (Stevens, supra,47 Cal.4th 625, 629, 632-635, 638, 639, 641, fns. omitted.)
Defendant's claim of being actually prejudiced by the deputy's actions is unpersuasive — the sole eyewitness testified that she saw defendant masturbating in the parking lot of a convenience store; defendant said he was merely urinating, but two years previously, defendant had admitted masturbating by the windowed side of an apartment building and after the charged incident, defendant was found by police across the street crouched down on the floorboard of a truck. *Page 772 
 DISPOSITION
The judgment is affirmed.
Gaut, J., and King, J., concurred.
[1] See People v. Hernandez, review granted December 9, 2009, S175615.
[2] Necessarily, a defendant is singled out and treated unlike any witness, and as though he were dangerous, when an armed deputy sits or stands near him as he sits at counsel table, yet defendant does not claim that this rendered his trial unfair. There is no evidence in the record before us whether the actions of the deputy here were unusual or whether it is common practice for testifying defendants to be escorted to and from the witness chair and to be near a deputy while in it.
[3] The California Supreme Court did not determine whether this deputy wore a firearm. (Stevens, supra,47 Cal.4th at p. 631, fn. 1.) *Page 773